**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **JORDAN WORKMAN,**<br>C/O Friedman & Gilbert<br>55 Public Square, Suite 1055<br>Cleveland, Ohio 44113,<br><br>And<br><br>**JESSICA BARNES,**<br>C/O Friedman & Gilbert<br>55 Public Square, Suite 1055<br>Cleveland, Ohio 44113,<br><br>And<br><br>**JASMINE BRUCE,**<br>C/O Friedman & Gilbert<br>55 Public Square, Suite 1055<br>Cleveland, Ohio 44113,<br><br>And<br><br>**DOMINIQUE KNOX,**<br>C/O Friedman & Gilbert<br>55 Public Square, Suite 1055<br>Cleveland, Ohio 44113,<br><br>And<br><br>**ERIC MAXWELL,**<br>C/O Friedman & Gilbert<br>55 Public Square, Suite 1055<br>Cleveland, Ohio 44113,<br><br>And<br><br>**TOMMIE PRATT,**<br>C/O Friedman & Gilbert<br>55 Public Square, Suite 1055<br>Cleveland, Ohio 44113, | Case No.: _____<br><br><br>JUDGE DAN AARON POLSTER<br><br><br><br>**(Jury Demand Endorsed Hereon)** |

1

And

**TANIS QUACH,**
C/O Friedman & Gilbert
55 Public Square, Suite 1055
Cleveland, Ohio 44113,

     **Plaintiffs,**

v.

**CITY OF CLEVELAND**,
Law Department
601 Lakeside Avenue East, Room 106
Cleveland, Ohio 44114,

And

**MAYOR FRANK G. JACKSON**,
in his official capacity,
C/O City of Cleveland Law Department
601 Lakeside Avenue East, Room 106
Cleveland, Ohio 44114,

And

**CHIEF OF POLICE CALVIN D. WILLIAMS**, in his official capacity,
C/O City of Cleveland Law Department
601 Lakeside Avenue East, Room 106
Cleveland, Ohio 44114,

     **Defendants.**

## COMPLAINT

1.     Plaintiffs invoke this Court's jurisdiction to protect their rights to assemble and to protest against Defendants without fear of retaliatory arrests and unnecessarily long custodial detentions.

2.      In May of 2015, Defendants had a policy – which was both announced and demonstrated – of using arrests and custodial detentions in order to deter and incapacitate protesters.

3.      Defendants' policy violated the First Amendment's guarantee of the rights to speech and peaceful assembly, and the Fourth Amendment's prohibition on unreasonable seizures.

4.      On May 23, 2015, the individual plaintiffs and dozens of other protesters and observers were lawfully and peacefully assembled in response to the acquittal of Cleveland Police Officer Michael Brelo.

5.      Without any probable cause or reasonable suspicion to believe that the protests were unlawful, the Defendants detained and arrested protesters and observers, including Plaintiffs, in various locations.

6.      After some unlawful arrests had already been made, Defendants herded the protesters and observers to a small alleyway, blocking the exits with armed officers to prevent movement.

7.      Minutes later, the Defendants began to arrest the protesters and observers, ostensibly for failing to comply with an order to disperse which no one heard and which was made impossible by the officers' own actions in preventing exit.

8.      All the protesters were then held in custody for this low-level misdemeanor for nearly 36 hours because, in the City's Deputy Chief of Police's own words, the Defendants did not want to "let [the protesters] back out on the streets to protest again."

9.      Plaintiffs ask the Court to remedy their constitutional rights in recognition of Defendants' effort to silence protests against the Defendants.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this matter pursuant to Article III of the Constitution of the United States and 28 U.S.C. §§ 1331 and 1343(3) and (4). The relief sought is authorized by the Constitution of the United States, 42 U.S.C. § 1983, and other law.

11.     This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2). The actions giving rise to this suit took place in this judicial district. Defendant City of Cleveland is located within this judicial district. Defendants Mayor Jackson and Chief of Police Williams, sued in their official capacities, work in this judicial district.

## PARTIES

### Plaintiffs

12.     Jordan Workman is a 31-year-old resident of Cleveland, Ohio. At the time of the events covered by this complaint, he was a longtime resident of the near west side of Cleveland and active in his community.

13.     Jessica Barnes is a 28-year-old resident of Lyndhurst, Ohio. At the time of the events covered by this complaint, Jessica, who is the mother of three children, was a student in the Dental Hygiene Program at Lakeland Community College. She has since graduated and is currently employed as a dental hygienist.

14.     Plaintiff Jasmine Bruce is a 21-year-old resident of Cleveland, Ohio. At the time of the events covered by this complaint, Jasmine Bruce was a student at Cuyahoga Community College.

15.     Dominique Knox is a 25-year old resident of Cleveland, Ohio. At the time of the events covered by this complaint, Plaintiff lived in Cleveland Heights and was an active member of his community.

4

16.     Eric Maxwell is a 41-year old resident of Cleveland, Ohio. At the time of the events covered by this complaint, Eric was employed as a heating and cooling contractor and managed his own rental properties. He has been active in his community as a kids' sports coach.

17.     Tommie Pratt is a 25-year-old resident of East Cleveland, Ohio. At the time of the events covered by this complaint, Tommie worked as a contractor for TOP Marketing.

18.     Tanis Quach is a 28-old resident of Cleveland, Ohio.  At the time of the events covered by this complaint, Tanis was a student at Cuyahoga Community College.

### Defendants

19.     Defendant City of Cleveland (the "City") is a municipal corporation located in Cuyahoga County, Ohio.

20.     Defendant Frank G. Jackson is the Mayor of the City of Cleveland, Ohio. He has served in this position since January 2, 2006. As Mayor, Jackson is the executive head of the City of Cleveland.

21.     Defendant Calvin D. Williams is the Chief of Police of Cleveland, Ohio. He has held this position since February 10, 2014. As the Chief of Police, Williams serves at the pleasure of the Mayor and is the head of the Cleveland Division of Police.

### FACTS

### The Brelo Verdict - May 23, 2015

22.     On the morning of May 23, 2015, the verdict in the trial of Michael Brelo, the Cleveland police officer charged with two counts of voluntary manslaughter for the deaths of Timothy Russell and Malissa Williams was announced. Brelo was found not guilty.

23.     The City of Cleveland and the Cleveland Division of Police anticipated that the announcement of the verdict was likely to trigger protests. In anticipation of possible mass

arrests, the City communicated with the Cleveland Municipal Court to ensure that judges would be on call and available as needed to process all arrestees without delay.

24.     Protests did, in fact, follow the announcement of the verdict. As the day of May 23 wore on, protesters became more numerous. Over the course of the day, hundreds of protesters gathered across Cleveland, marching together in the streets downtown and in other areas of the City.

25.     Legal Observers also assembled at these protests to observe and document law enforcement conduct in response to the protests.

**Peaceful Demonstrations Convene Across the City**

26.     During the course of the afternoon, dozens of protesters demonstrated peacefully in front of the Justice Center. Legal Observers were present.

27.     That afternoon, there was also a demonstration in honor of Tamir Rice at Impett Park in the West Park neighborhood.  Legal Observers were present.

28.     Also during the same afternoon, a large-scale demonstration with hundreds of attendees was held at Cudell Recreation Center, the site where Tamir Rice was shot to death by a Cleveland police officer. Legal Observers were present.

29.     In the early evening, a large contingent of the Cudell demonstrators marched back toward downtown.  Legal Observers continued to accompany the protests.

30.     During this march, law enforcement officers on horseback used their horses to control and create fear among the marchers.

31.     Also during this march, Cleveland police officers on motorcycles zipped up behind protesters in a threatening manner.

32.     The protesters and Legal Observers reached downtown and continued to march around the downtown area.

### Cleveland Police Make Unlawful Arrests at East 4th Street

33.     Mid-evening, protesters funneled into East 4th Street, where they stopped, held signs, and/or chanted as patrons at the surrounding restaurants looked on. Legal Observers continued to accompany the protests.

34.     Plaintiff Tanis Quach one of the protesters who stopped at East 4th Street.

35.     Some patrons hurled verbal insults at protesters. The tension rose and someone threw a glass, which shattered on the ground, and a brief moment of chaos erupted. Protesters quickly moved away from the patrons and patrons went inside the restaurants.

36.     Tanis stood peacefully several yards away with his protest sign, near a street musician, watching as the scene calmed down.

37.     As many protesters moved northbound toward Euclid Avenue, Tanis stood and watched a group of police walk down East 4th Street.

38.     As they passed him, Tanis heard one Cleveland police officer say to another Cleveland police officer, "Grab him, too, right?" The second officer looked at Tanis, and said to the first officer, "Grab him."

39.     The first officer walked to Tanis and grabbed his sign and dropped it on the ground. Without reasonable suspicion, and without probable cause, the officer arrested Tanis, using metal handcuffs.

40.     The officer applied the handcuffs extremely tightly, causing Tanis to cry out in pain. Eventually the arresting officer loosened the cuffs.

41.     Tanis was not told why he was being arrested, despite repeatedly asking why he was being detained.

42.     Tanis had not heard police make any dispersal order prior to his arrest.

43.     Tanis was placed into the back of a van with other arrested protesters.

44.     Following this incident, around 8:30 p.m., Protesters, including the remaining Plaintiffs, moved east on Euclid Avenue towards East 9th Street. The protesters were marching peacefully, obeying police orders.

45.     There were approximately 100 police officers, suited and equipped with riot gear, marching as well.

### Cleveland Police Herd Remaining Protesters and Observers into Johnson Court, Prevent Protesters and Observers from Leaving, and Arrest the Entire Group

46.     At approximately 9:45 PM, protesters, including Plaintiffs, marched up West 6th Street.  Their northbound progress was blocked by a police vehicle in the middle of the road.

47.     Protesters and Legal Observers, including Plaintiffs, also saw police blocking the street behind them. They could not turn around and go southbound down West 6th Street.

48.     Protesters and Legal Observers, including Plaintiffs, turned left, heading westbound into Johnson Court, a small alleyway that extends for the one block between West 6th and West 9th Streets. The protesters were chanting and otherwise expressing themselves in a lawful manner.

49.     As the protesters and Legal Observers, including the remaining Plaintiffs, entered the alley, a horde of Cleveland police officers, in full riot gear, were suddenly visible at the far end of Johnson Court near West 9th Street, and also came from behind them at West 6th Street.

50.     The riot-gear clad police officers then blocked both the west and east entrances to the alley by arranging themselves into a barrier consisting of at least two rows of officers holding shields.

51.     Protesters, including Plaintiffs, were completely trapped inside the alley with no way out. The scene was captured by video.

52.     Though some protesters, including Plaintiffs, could hear officers yelling "move back," they were unsure of how to comply with the order because there was nowhere for the protesters to move. It was impossible to understand what the police meant by this ambiguous order – especially because they were shouting it from both sides.

53.     Several protesters pleaded with the officers, asking, "Where are we supposed to go?" and, "What do we do?"

54.     Most of the group of protesters and Legal Observers, out of confusion and fear, then put their hands up.

55.     At this time, Plaintiff Jordan Workman, who had been accompanying the protests as a Legal Observer, was standing in the crowd.

56.     Suddenly, two police officers broke through the police line, and ran toward Jordan, almost knocking over other protesters as they ran.

57.     The officers grabbed Jordan and arrested him, using plastic handcuffs.

58.     One officer asked Jordan, "Did you come out here to be arrested today?"

59.     Jordan responded, "No, I had no intention of being arrested. I just came out to be a legal observer and see what was going on."

60.     Some protesters wanted to approach the line of officers to ask if they could leave, but they knew they would be arrested if they did because anyone who approached the line was grabbed and arrested.

61.     Officers then broke their formations and began to run and physically force everyone onto the sidewalk. In doing this, some officers applied so much force to some protesters that they left red marks that were still visible the next day.

62.     Several protesters asked the officers why they could not leave, and if there was someone in charge they could talk to.  The police would not answer.

63.     The only opening from the alleyway was a temporary small gap in the line of officers who were blocking the west end of the alley.

64.     Some protesters overheard that officers had opened the gap so that protesters could leave.

65.     Some protesters heard an officer command over a megaphone that if protesters "didn't want to get arrested," they needed to "form a single-file line," and that if they complied they would be "free to go."

66.     Accordingly, some protesters formed a line so that they could exit the alley.

67.     To their surprise, however, the officers came down the line and began to put "flexicuffs" tightly on the protesters' – including the remaining Plaintiffs' – wrists, and these protesters were arrested.

68.     Nearly all of the protestors and onlookers inside Johnson Court – approximately 70 individuals – were arrested, including Plaintiffs.

69.     Protesters, including Plaintiffs, were later informed that their arrest was for "failure to disperse," a misdemeanor.

70.     Plaintiffs did not hear an order to disperse, nor could they have dispersed if such an order was given since any available exit was blocked by lines of police officers.

71.     Plaintiffs' conversations among numerous other arrestees revealed that no others had heard such an order either.

72.     People arrested in Johnson Court were handcuffed tightly using plastic handcuffs.

73.     Though the handcuffs caused pain, some protesters did not complain after witnessing retaliation from officers. For example, an elderly women's handcuffs were further tightened by police officers when she pleaded that they were too tight.

**Protesters Are Processed and Booked in Awful Conditions at Burke Lakefront Airport**

74.     Plaintiffs and other protesters were then taken to Burke Lakefront Airport around 11:00 p.m., where they were made to sit on the concrete floor of an empty hangar.

75.     Conditions were wretched: there were rat feces on the filthy floor, and some protesters saw rats scurrying around the building. Requests for water, after a long and very hot day, fell upon deaf ears.

**Jail Facilities**

76.     Later that night, Plaintiffs and other protesters were transported from the hangar to the city jail on West 3rd Street.

77.     When they arrived, though the cells were designed for one inmate, two were placed in almost every cell. Thin, dirty mats were distributed to serve as beds.

78.     At the city jail, several arrested protesters, including Plaintiffs Eric Maxwell, saw bedbugs in their cells, on the bedding, and climbing onto their own clothing. They informed City of Cleveland correctional officers about the bed bugs.

79.     In response, City of Cleveland correctional officers merely sprayed an aerosol can into the cell and moved these individuals to different cells.

80.     After 12 hours in the city jail, some of the arrested protesters, including Jessica Barnes, were transferred to the County Workhouse, around 1:00 p.m., now May 24, 2015. The other protesters, including Jordan Workman, Tanis Quach, and XX, remained at the city jail downtown.

81.     At the Workhouse, the only drinking water available was contaminated by a broken sewer line and was murky and discolored.

82.     About 24 hours after their arrests, Plaintiffs and other protesters at the Workhouse were informed that he and the others were being charged with "obstructing traffic" and "failure to disperse."

83.     The arrested protesters and observers, including Plaintiffs, talked amongst themselves. None of them had heard any police order to disperse. Even if such an order had been given, and even if it had been heard – which it was not – police officers had made compliance impossible by trapping the protesters inside the alley.

84.     Some protesters, including Plaintiffs, heard the guards state that protesters were not yet being released to prevent any disruption of a Cleveland Major League baseball game taking place that evening.

85.     Other protesters, including Plaintiffs, heard they would not be released due to a Cleveland Cavaliers basketball game that night. In fact, this rationale for not releasing the protesters was provided by multiple officers on different shifts.

86.     Formal charges of "failure to disperse" were filed against Plaintiffs and other protesters on the night of Sunday May 24, 2015.

87.     Plaintiff Jasmine Bruce posted bond that night, and was then released from jail around 3:00 AM on May 25, 2015.

### Protesters and Observers Are Arraigned and Released.

88.     Plaintiffs, except for Jasmine Bruce, along with nearly 60 protestors, were held for another night until the morning of Monday, May 25, 2015 before they finally entered a courtroom for an arraignment hearing.

89.     These Plaintiffs entered a plea of not guilty to the charge of "failure to disperse."

90.     These Plaintiffs were released from City of Cleveland custody on May 25, 2015.

91.     Plaintiff Jasmine Bruce, who had previously bonded out of jail, was arraigned on May 27, 2015. She also entered a plea of not guilty to the charge of "failure to disperse."

### Protesters and Observers Are Prosecuted Over a Period of Months, and Their Cases Are Dismissed.

92.     Plaintiffs all faced prosecution for "failure to disperse" charges in the Cleveland Municipal Court, in Cleveland, Ohio.

93.     Plaintiffs were forced to return to court several times over the following months, missing school, work, and other obligations, for pre-trial hearings.

94.     Plaintiffs lived with the stress and burden of this prosecution for the months-long period during the pendency of the false charges.

95.     Several months later, the false charges against Plaintiffs were finally dismissed and the cases were terminated in Plaintiffs' favor.

### Jordan Workman

96.     Jordan joined the protests that day as a Legal Observer for the Ohio Chapter of the National Lawyers Guild.

13

97.     As a Legal Observer, Jordan assembled with protesters and walked with them as they marched around the City of Cleveland.

98.     As a Legal Observer, Jordan observed and documented law enforcement conduct in response to the day's protests.

99.     On May 23, 2015, Jordan arrived in downtown early in the morning to fulfil his role as a Legal Observer. He observed at the Impett Park protest, and then at Cuddell.

100.    After observing at Cuddell, Jordan took a dinner break and moved his car downtown. He rejoined the protesters, assembling with them at West 65th Street and Detroit Avenue as they headed downtown.  Once downtown, he took another rest break.

101.    Jordan then assembled again with the protesters, who were near Prospect Avenue.

102.    Jordan walked with the protests onto East 4th Street, where he observed the moment of tension and brief chaos there. He witnessed some arrests of protesters and others on East 4th Street.

103.    Jordan then continued to move with the protest onto Euclid Avenue, which continued to wind its way through downtown.

104.    Jordan walked with the protesters as they moved up West 6th Street and then were forced to enter into Johnson Court.

105.    After the police closed in on both sides of the alley, Jordan witnessed Cleveland police officers breaking through the police lines and plucking protesters from the alley. Then two Cleveland police officers quickly jumped in and grabbed Jordan, as described above, using plastic handcuffs. They did not provide a reason for his arrest. Jordan never heard a dispersal order prior to his arrest.

106.    Jordan was taken to Aviation High School, and then to the City Jail. While there, he saw cockroaches on the filthy floors of the jail. He remained in the City Jail on the nights of May 23 and 24, 2015.

107.    Jordan remained in custody until he was charged and appeared in court on May 25, 2015, in Case No. 2015 CRB 010527.

108.    Throughout the malicious prosecution of the false charges against him, Jordan was forced to appear in court several times.

109.    On November 9, 2015, the false charges against him were finally dismissed and the case was terminated in his favor.

110.    Had Jordan not been arrested and detained, he would have continued to serve as a Legal Observer at protests on the night of May 23 and again on May 24.

111.    After his release, Jordan experienced anxiety related to his arrest and detention.

112.    As a result of this arrest, detention, and prosecution, Jordan has never again acted as a Legal Observer or attended any protest. He fears being wrongfully arrested and prosecuted again in the future.

113.    Also as a result of this arrest, Jordan was visited at his home in 2016 by FBI agents who attempted to interrogated him about his activities in the lead-up to the Republican National Convention in Cleveland. The agents attempted to intimidate and harass him.

**Jessica Barnes**

114.    The march on May 23, 2015 was Jessica Barnes' first protest. She followed the Brelo case in the news and felt inspired to join the protest after she heard the verdict. She felt she needed to join others to express her condemnation of the police action and the verdict.

115.    Jessica drove downtown and joined the protest alone. She marched with the group around downtown, down to Cudell Commons where she participated in a vigil in honor of Tamir Rice, and then marched back downtown.

116.    The protest remained peaceful and was facilitated by police officers who flanked the marchers as they moved around the city.

117.    As the protest moved north-bound on W. 6th Street, Jessica saw a line of police carrying shield forming a line in front of the march, positioned to force the march onto Johnson Court.

118.    Jessica realized she was trapped by the police on Johnson Court.  Although she wanted to leave she could find no way out.

119.    Jessica never heard an order to disperse at any point on March 23, 2015. She did hear many protesters begging police to allow the group to leave, but their pleas fell upon deaf ears.

120.    Instead, Jessica was arrested as she stood in a single file line along with other marchers, trying to leave Johnson Court and go home.  She was not given a reason for her arrest.

121.    Jessica remained in custody until she was charged and appeared in court on May 25, 2015, in Case No. 2015 CRB 010528. She spent these days mired in concern for the well-being of her children, for whom she is the primary care provider.

122.    Throughout the malicious prosecution of the false charges against her, Jessica was forced to appear in court several times, missing school and causing great fear and distress.

123.    On November 12, 2015, the false charges against her were finally dismissed and the case was terminated in her favor.

124.    As a result of this arrest, Jessica was visited at her home in 2016 by FBI agents who interrogated her about her activities in the lead-up to the Republican National Convention in Cleveland. The agents intimidated and harassed her, demanding she disclose her activities, name of associates and affiliations.

125.    Because of this harrowing experience during her first attempt at First Amendment expression, Jessica is now too scared to ever join another protest. She remains concerned that this arrest will tarnish her reputation.

**Jasmine Bruce**

126.    On May 25, 2015, Jasmine Bruce learned that people planned to protest the acquittal of Michael Brelo through social media and through friends.

127.    The news of Brelo's acquittal was heart-wrenching to Jasmine, who had been active in protests about the shooting death of Tamir Rice by a Cleveland police officer. Jasmine was an activist concerned with taking a stand against police brutality and violence against the Black community.

128.    Jasmine felt compelled to join the protests that day because she was dismayed that no one would be held accountable for the death of Timothy Russell and Malissa Williams.

129.    Jasmine joined the protesters, and was present at Cudell during the vigil and rally.

130.    After the event at Cuddell was done, she drove downtown and parked her car, and joined the protest again, which was then in the area of the Justice Center.

131.    Jasmine and other protesters then left the Justice Center and rushed to the area of East 4th Street after they heard that protesters there were in need of help. She and others ran to observe what was going on at the intersection of Euclid Avenue and East 4th Street.

132.     Jasmine then re-joined the protest as it continued up Euclid Avenue to the area of East 9th Street. At that intersection, a Cleveland police officer rode up on motorcycle and stopped right in front of Jasmine as she and other protesters were chanting. He laid on his horn, drowning out the sounds of the chanting, and mockingly holding his hand up to his ear, indicating that he could not hear them.

133.     The protest continued, and Jasmine was with the group as they entered Johnson Court. Jasmine watched as police lines advanced into the alley from both sides. She and the other protesters were trapped.

134.     Jasmine heard police tell everyone to get into a line and to walk out of alley. She and her friends followed the order, thinking they would be released after they left the alley. Jasmine was near the very front of the line, near the West 9th Street end of the alley.

135.     About a dozen people in front of Jasmine walked through the police line and were let go. Just as Jasmine and her friends were about to walk through to freedom, she saw a Cleveland police officer in a white shirt yell, "No! Arrest them now!"

136.     Immediately following this order, riot gear-clad police began arresting the protesters in the alley.

137.     Police officers approached Jasmine, and applied plastic handcuffs and sat her and everyone down on the ground.  They did not tell her why she was arrested or what she was charged with.

138.     While the arrests were taking place, Jasmine heard two officers make statements about how tired they were and that they were tired of "chasing" the protesters all day, and that "this is what happens" in response to such protests.

139.     Jasmine and others were transported to Aviation High School, and then to the City Jail. In the City Jail, they had run out of room to house arrested protesters by the time Jasmine arrived and was booked. Cleveland correctional officers placed Jasmine and two other women in the phone call cell, which was not meant to house prisoners other than for the temporary purpose of making phone calls. They were so cramped that they could not lie down, and there was only one mat for the three women to share.

140.     Half-way through the night, correctional officers moved Jasmine and the two other women to another holding cell where another woman, who was not a protester, was already being held.

141.     The next morning, they moved Jasmine and the two other protester women to yet another cell, this time having them wait inside a larger holding cell, where they had no mats and nothing to sit on. They remained there until they were transferred to the work house later that day.

142.     In the work house, Jasmine observed black mold in the showers and all over the bathrooms. Correctional officers told them arrested protesters, including Jasmine, that they had to clean the bathroom facilities themselves. Further, the water available for drinking was discolored and contained floating debris.

143.     On Sunday, May 24, 2015, when the charges were finally processed for everyone arrested at the protest, Jasmine's mother bonded her out. She was released at approximately 3 A.M. on May 25, 2015.

144.     Jasmine appeared in court on May 27, 2015 for an arraignment hearing in Case No. 2015 CRB 010481.

145.    During the pendency of her criminal case, Jasmine had a part-time job and missed work to attend pretrials. She was also traumatized by the experience to the point that she discontinued attending school classes at Cuyahoga Community College for the rest of the semester.

146.    Throughout the malicious prosecution of the false charges against her, Jasmine was forced to appear in court several times, missing school and causing great fear and distress.

147.    On October 30, 2015, the false charges against her were finally dismissed and the case was terminated in her favor.

148.    Had Jasmine not been arrested and detained, she would have continued to protest on the night of May 23 and on May 24.

149.    As a result of her arrest, detention, and prosecution, Jasmine has not participated in any protests since May 23, 2015. Prior to these events, she had participated regularly in protests as activist. She is now afraid of being unlawfully arrested again while engaged in the lawful exercise of her constitutional rights. She also fears being unlawfully held in jail, and feels that she cannot risk protesting and the possibility of going to jail because of the cost of missing work.

150.    Also as a result of her arrest, in the early summer of 2016, FBI agents and/or Cleveland police went to Jasmine's mother's house and attempted to inquire about her activism activities. Jasmine was not at home but learned about this visit from law enforcement from her mother. This visit intimidated Jasmine and caused her to be fearful.

**Dominique Knox**

151.    Dominque Knox had been active in the time leading up to the Brelo protest as an activist fighting against police terror and other injustices. When he learned about Brelo's

acquittal, he felt compelled to join the protests that day against the injustices suffered by Timothy Russell and Malissa Williams.

152.    Dominique joined the protest in the early afternoon, and was present at Cuddell, and when the protest again reached downtown, and all the way to Johnson Court.

153.    Dominique witnessed Cleveland police officers advancing from both sides of the alley. He did not hear any dispersal orders. He did, however, hear police say something to the effect of "line up against the wall, then we'll let you go."

154.    Dominique and other protesters lined up, but then Cleveland police started making arrests.  Dominique was arrested. No one told him why he had been arrested or what he was charged with.

155.    After being transported to Aviation High School, Dominique saw rats scurrying around as the arrested individuals were processed.

156.    Then, in the City Jail, Dominique saw bed bugs and also saw other protesters complain about bed bugs. He saw correctional officers spray the cell of the complaining protesters. He was itchy and had irritated skin and some bug bites after being in the City Jail.

157.    Dominique was then transferred to the Workhouse, where the drinking water was discolored with floating debris, including bugs.

158.    Dominique remained in custody until he was charged and appeared in court on May 25, 2015, in Case No. 2015 CRB 010502.

159.    Had Dominique not been arrested and detained, he would have continued to protest on the night of May 23, and on May 24.

160.    Throughout the malicious prosecution of the false charges against him, Dominique was forced to appear in court several times.

161.    On November 9, 2015, the false charges against him were finally dismissed and the case was terminated in his favor.

162.    As a result of this arrest, detention, and prosecution, Dominique fears being wrongfully arrested and prosecuted again in the future.

163.    Dominque was, in fact, detained without reasonable suspicion or probable cause again by Cleveland police while protesting at a City Council meeting on October 20, 2015. Though many people were protesting, Dominique was the only one detained. He was not charged.

### Eric Maxwell

164.    Eric Maxwell joined the protest on May 23, 2015 because he was outraged at the Brelo acquittal.  He was also outraged at the shooting death of Tamir Rice at Cuddell Recreation Center, where Eric had previously coached sports teams.

165.    Eric remained in custody until he was charged and appeared in court on May 25, 2015, in Case No. 2015 CRB 010505. That weekend, he missed work and was unable to uphold his obligations to his son, who was getting ready to graduate from high school and attend prom. Eric not only missed work that weekend, and money needed to support his son's prom activities, but he also missed his obligations to ensure that details for prom were in place, such as tuxedo rental, car rentals, and other tasks.

166.    Throughout the malicious prosecution of the false charges against him, Eric was forced to appear in court several times.

167.    On November 9, 2015, the false charges against him were finally dismissed and the case was terminated in his favor.

### Tommie Pratt

168. Tommie remained in custody until he was charged and appeared in court on May 25, 2015, in Case No. 2015 CRB 010509.

169. Throughout the malicious prosecution of the false charges against him, Tommie was forced to appear in court several times.

170. On October 30, 2015, the false charges against him were finally dismissed and the case was terminated in his favor.

**Tanis Quach**

171. Tanis remained in custody until he was charged and appeared in court on May 25, 2015, in Case No. 2015 CRB 010511.

172. Throughout the malicious prosecution of the false charges against him, Tanis was forced to appear in court several times.

173. On October 20, 2015, the false charges against him were finally dismissed and the case was terminated in his favor.

**Cleveland Division of Police Admits Its Policy of**
**Corralling and Detaining Protestors to Keep them off the Streets**

174. Unknown to the protesters, Cleveland Municipal Court had been prepared to process the arrestees on Saturday, May 24, 2015.

175. Judges were available, and prosecutors and defense counsel were lined up to complete processing and arraignment.

176. But the Division of Police did not bring protesters to court that day. Instead, the police delayed until Memorial Day, May 25, 2015 to bring the arrestees to court.

177. On June 24, 2015, when Cleveland Deputy Chief of Police Dornat "Wayne" Drummond was asked why protesters charged with low-level misdemeanors were arrested instead of cited and immediately released, he explained, "I'll let the Law

Department respond to your concerns, but from my perspective, it doesn't make much sense to cite and release the protestors and let them back out on the streets to protest again."

## Ongoing Effects of May 23, 2015 Arrests

178.    Defendants' heavy-handed, punitive response to the May 23 protests had a large impact on local activists.

179.    Many law-abiding citizens, including some Plaintiffs, are now understandably reluctant to attend or participate in lawful protests within the City of Cleveland.

## CAUSES OF ACTION

### COUNT ONE

**Constitutional and Civil Rights Pursuant to 42 U.S.C. § 1983 Violation of First Amendment Retaliation Based on Speech and Assembly**

**(Against all Defendants)**

180.    All of the foregoing paragraphs are incorporated as though fully set forth here.

181.    Peaceful protesting and assembly are fundamental constitutional activities protected by the First Amendment to the United States Constitution.

182.    Defendants' policy and actions of citing, arresting, and imprisoning Plaintiffs for two full nights and nearly a day and a half, and charging them with crimes, were at least partly – if not solely – motivated by Defendants' response to the individual Plaintiffs' exercise of their First Amendment rights to protest and assemble peacefully.

183.    Defendants' policy and actions punished the individual Plaintiffs for engaging in their constitutionally protected activities of peaceful protest and assembly.

184.  Defendants' policy and actions, not to "let them back on the streets," thus constitute retaliation against the individual Plaintiffs for Plaintiffs' exercise of fundamental First Amendment rights.

185.  Defendants' policy and actions would chill a person of ordinary firmness from engaging in the constitutionally protected activities of peaceful protest and assembly.

186.  As a direct result of Defendants' unconstitutional policy and practice, and the constitutional violations committed by Defendants, Plaintiffs have suffered serious personal injuries and are entitled to relief under the US Constitution and 42 U.S.C. § 1983.

187.  Defendants' unconstitutional policy of retaliation against protesters has caused and will continue to cause irreparable harm to Plaintiffs, and the community at large, to engage in the constitutionally protected activities of peaceful protest and assembly.

## COUNT TWO

### Constitutional and Civil Rights Pursuant to 42 U.S.C. § 1983 Violation of First Amendment Prior Restraint

### (Against all Defendants)

188.  All of the foregoing paragraphs are incorporated as though fully set forth here.

189.  Defendants arrested Plaintiffs and kept Plaintiffs detained for the purpose of preventing them from protesting later in the night on May 23, 2015 and on Sunday, May 24, 2015.

190.  This unconstitutional policy and practice of Defendants prevented Plaintiffs and other protesters from expressing their views publicly. This policy and practice of Defendants imposed a prior restraint on Plaintiffs' speech, in violation of Plaintiffs' Constitutional rights.

191.    As a direct result of these constitutional violations committed by Defendants, Plaintiffs have suffered and continue to suffer serious personal injuries and are entitled to relief under the US Constitution and 42 U.S.C. § 1983.

192.    Defendants' unconstitutional policy of prior restraint of speech poses irreparable injury to the rights of all of the Plaintiffs, and of the community at large, to engage in the constitutionally protected activities of peaceful protest and assembly.

### COUNT THREE

**Constitutional and Civil Rights Pursuant to 42 U.S.C. § 1983 Violation of Fourth Amendment Right to be Free of Unlawful Seizure: Seizure by Restricting Plaintiffs' Movement in Johnson Court Without Reasonable Suspicion**

**(Against all Defendants)**

193.    All of the foregoing paragraphs are incorporated as though fully set forth here.

194.    Defendants, acting through their agents in the police department, caused Plaintiffs to be trapped in Johnson Court by herding them into a confined space and blocking all available exits.

195.    The Fourth Amendment requires that restrictions on movement and liberty be carefully justified by objective facts showing reasonable suspicion or probable cause to believe that the individual had committed a crime.

196.    When they herded the protesters into Johnson Court, Cleveland police officers had no reasonable suspicion or probable cause to believe that Plaintiffs or the protesters or Legal Observers or any particular protester in the group had violated any law.

197.    By restricting the protesters movement into Johnson Court without reasonable suspicion or probable cause, Defendants subjected Plaintiffs to an unreasonable seizure in violation of the Fourth Amendment.

198.    As a direct result of these constitutional violations committed by Defendants, Plaintiffs have suffered and continue to suffer serious personal injuries, and are entitled to relief under the federal constitution and 42 U.S.C. § 1983.

### COUNT FOUR

**Constitutional and Civil Rights Pursuant to 42 U.S.C. § 1983 Violation of Fourth Amendment Rights
Unlawful Seizure By Arresting Plaintiffs Without Probable Cause**

**(Against all Defendants)**

199.    All of the foregoing paragraphs are incorporated as though fully set forth here.

200.    Plaintiffs were charged under Cleveland's "failure to disperse" ordinance, which states that, "No person shall knowingly fail to obey such order." (emphasis added) Cleveland, Ohio Municipal Code § 605.02.

201.    However, Plaintiffs did not hear an order, assuming in fact that any such order was given. If an order was given, it was not reasonably calculated to be heard by the protesters.

202.    Without knowledge of such an order, Plaintiffs could not have "knowingly" failed to obey the order. The City's officers were made aware of this in Johnson Court by the numerous requests for clarification made by the protesters.

203.    Alternatively, even assuming arguendo an order had been given, and Plaintiffs heard the order, compliance was made impossible since police did not allow protesters to disperse, either by immediately arresting them or by blocking the only exits from Johnson Court.

204.    Because Plaintiffs were unaware of any order to disperse—again, assuming such order was given—and because compliance with any order was rendered impossible

by the Cleveland police department, Plaintiffs' arrests and subsequent imprisonment for "failure to disperse" were without probable cause.

205.   By arresting and imprisoning Plaintiffs without probable cause, Defendants violated Plaintiffs' Fourth Amendment right to be free from unreasonable seizures.

206.   As a direct result of these constitutional violations committed by Defendants, Plaintiffs have suffered and continue to suffer serious personal injuries and are entitled to relief under the federal constitution and 42 U.S.C. § 1983.

## COUNT FIVE

### Constitutional and Civil Rights Pursuant to 42 U.S.C. § 1983 Violation of Fourth Amendment Rights
### Unlawful Seizure – Extended Detention

### (Against all Defendants)

207.   All of the foregoing paragraphs are incorporated as though fully set forth here.

208.   Plaintiffs were charged under Cleveland's "failure to disperse" ordinance, § 605.02, which is a misdemeanor.

209.   The courts, prosecutors, and public defenders were all ready and available to process the protesters on Sunday, May 24, 2015. However, Defendants caused the protesters to not be brought before the available judges or released from custody. The delay was unnecessary, and motivated to interfere with and retaliate against the exercise of constitutional rights.

210.   Defendants' policy and practice of holding protesters in custody for longer than necessary, and increasing the length of custody for an improper motive, violated Plaintiffs' Fourth Amendment right to be free from an unreasonable seizure.

211.    As a direct result of these constitutional violations committed by Defendants, Plaintiffs have suffered and continue to suffer serious personal injuries and are entitled to relief under the federal constitution and 42 U.S.C. § 1983.

212.    Defendants' unconstitutional policy of holding protesters in custody for the improper motive of  keeping them from protesting threatens the rights of all of the Plaintiffs, and of the community at large, to engage in the constitutionally protected activities of peaceful protest and assembly without facing unnecessarily long detentions.

### COUNT SIX

**Constitutional and Civil Rights Pursuant to 42 U.S.C. § 1983
Malicious Prosecution**

**(Against all Defendants)**

213.    All of the foregoing paragraphs are incorporated as though fully set forth here.

214.    In the manner described more fully above, Defendants and/or employees/subordinates/agents of Defendants, acting individually, jointly and in conspiracy with each other, instigated, influenced or participated in the decision to prosecute Plaintiffs, knowing there was no probable cause for the criminal prosecution.

215.    The charges were terminated in favor of Plaintiffs.

216.    Defendants and/or employees/subordinates/agents of Defendants accused Plaintiffs of criminal activity knowing those accusations to be without genuine probable cause.

217.    Defendants and/or employees/subordinates/agents of Defendants made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

29

218. Defendants and/or employees/subordinates/agents of Defendants, acting individually, jointly, and in conspiracy with each other, deliberately engaged in arbitrary and conscience-shocking conduct that contravened fundamental canons of decency and fairness and violated Plaintiffs' substantive due process rights and in violation of the Fourteenth and Fourth Amendments to the United States Constitution.

219. Defendants and/or employees/subordinates/agents of Defendants acted under color of law and within the scope of their employment when they took these actions.

220. As a direct and proximate cause of Defendants' and/or their employees'/subordinates'/agents' misconduct, Plaintiffs suffered and continue to suffer injury and damages as set forth in this Complaint.

**COUNT SEVEN**

**Constitutional and Civil Rights Pursuant to 42 U.S.C. § 1983**
***Monell* claim**
**(Against Defendant City of Cleveland)**

221. All of the foregoing paragraphs are incorporated as though fully set forth here.

222. The constitutional violations by Defendants and/or their employees/subordinates/ agents as set forth in this Complaint are not an isolated incident.

223. The conduct of Defendants and/or their employees/subordinates/agents as set forth in this Complaint resulted from and were taken pursuant to City of Cleveland policies (even if not official written edicts), practices, and/or customs of civil rights violations and unconstitutional practices.

224. Moreover, the conduct of Defendants Mayor Frank Jackson and Chief of Police Calvin Williams and/or their employees/subordinates/agents demonstrates the City of

Cleveland's custom of tolerance or acquiescence of civil rights violations and unconstitutional practices.

225.  In addition, Defendants Mayor Frank Jackson and Chief of Police Calvin Williams were final policymakers with regard to the events at issue in this Complaint. Their roles as policymakers subjects the City of Cleveland to liability under the *Monell* doctrine.

226.  The City of Cleveland, at all times relevant herein, approved, authorized, and acquiesced in the unlawful and unconstitutional conduct of its respective employees and/or agents and consequently is directly liable for the acts of those agents, pursuant to 42 U.S.C. § 1983.

227.  Alternatively, the conduct of various Cleveland Police Officers as set forth in this Complaint demonstrate that they are inadequately trained and supervised by Defendant City of Cleveland and/or demonstrates a custom of tolerance or acquiescence by Defendant City of Cleveland of civil rights violations, and/or shows Defendant City of Cleveland's policies (even if not official written edicts), practices, and/or customs of unconstitutional practices with regard to properly respecting Constitutional Rights as described above. Therefore, Defendant City of Cleveland is liable pursuant to the *Monell* doctrine and 42 U.S.C. § 1983.

228.  As a direct and proximate result of Defendant City of Cleveland's actions and omissions, Plaintiffs suffered and continue to suffer injuries and damages as set forth in this Complaint.

## PRAYER FOR RELIEF

Plaintiffs request that this Court enter judgment against Defendants City of Cleveland,

Jackson, and Williams providing the following relief:

A.   Damages in whatever amount Plaintiffs are found to be entitled;

B.   Injunctive Relief and Declaratory Relief;

B.   An award of interest, costs, and attorney's fees pursuant to 42 U.S.C. Section

1988; and

C.   All other relief which this Honorable Court deems equitable and just.


## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.




Respectfully Submitted,


/s/ Jacqueline C. Greene
TERRY H. GILBERT (0021948)
SARAH GELSOMINO (0084340)
JACQUELINE C. GREENE (0092733)
FRIEDMAN & GILBERT
55 Public Square, Suite 1055
Cleveland, OH 44113-1901
Tel: (216) 241-1430
Fax: (216) 621-0427
Email: tgilbert@f-glaw.com
        sgelsomino@f-glaw.com
        jgreene@f-glaw.com

*/s/ James L. Hardiman*
James L. Hardiman (0031043)
3615 Superior Avenue, Suite 3101-D
Cleveland, Ohio 44114
Tel: (216) 431-7811
Fax: (216) 431-7644
Email: attyjhard@aol.com


*/s/ John P. Hildebrand, Sr.*
John P. Hildebrand, Sr. (0025124)
21430 Lorain Road
Fairview Park, Ohio 44126
Tel: 440-333-3100
Email: legaljack@aol.com


*Attorneys for Plaintiffs*